**Judy Ann Brackeen, Plaintiff-Appellant, v. Roberta L. Milner, Defendant-Appellee.**

**Gen. No. 50,550.**

First District, Fourth Division.

June 9, 1967.

Rehearing denied December 12, 1967.

James N. Vail and Vail and Rollberg, of Chicago, for appellant.

Peterson, Lowry, Rall, Barber & Ross, of Chicago (Walter W. Ross and Herbert C. Loth, Jr., of counsel), for appellee.

MR. JUSTICE McCORMICK delivered the opinion of the court.

This appeal was taken from an order of the trial court entering a summary judgment in favor of the defendant and against the plaintiff, and denying the plaintiff's motion for summary judgment as to defendant's affirmative defense. The plaintiff had brought suit to recover

damages flowing from the alleged negligence of the defendant and had demanded a jury trial. The defendant filed an answer denying negligence, denying that plaintiff at the time of the accident (April 4, 1963), was exercising due care, and affirmatively pleaded that on April 12, 1963, plaintiff had signed a release as to all claims against the defendant.

On December 11, 1963, plaintiff filed a reply to the affirmative defense in which she stated that the release had been obtained from her while she was a patient in the Henrotin Hospital in Chicago, under sedation and in a weakened condition due to a cerebral concussion, whiplash, lacerations about the head and body and fractured vertebrae received in an automobile accident eight days earlier. She stated that as a result she was deprived of her mental faculties and incapable of entering into a contract. She also alleged that the insurance adjuster who obtained the alleged release had visited her four days after the occurrence "in violation of the rules of the hospital and the plaintiff's doctor"; that he had obtained the trust and confidence of the plaintiff and had continually assured her that everything would be taken care of. It is further alleged that on August 9, 1963, the plaintiff sent notice of disaffirmance of the alleged release to the defendant and her insurance carrier, Allstate Insurance Company, together with a certified check for $450, payable to the order of the defendant and her agent and insurance company.

On May 18, 1964, the defendant filed a motion for summary judgment, in which motion defendant summarized the pleadings and set out extracts from the plaintiff's deposition with regard to her contact with the insurance adjuster. The last paragraph in the motion asked for an order for summary judgment for the defendant "because there is no genuine issue of material fact, but that plaintiff signed a release while she was

in complete control of her mental faculties and free from duress or undue influence."

On September 16, 1964, by leave of court the plaintiff filed a supplemental reply to the affirmative defense pleaded by the defendant in which she reiterated the matters set up in her reply, and in addition stated that the agent of the Allstate Insurance Company had told the plaintiff he would advise her as a friend that it was in her best interest not to retain an attorney; that it was in her best interest not to file suit against the defendant; and that since plaintiff "did not have any witnesses she would end up paying attorney fees and court costs and all the hospital and doctor bills"; that plaintiff acted upon the "fraudulent and untrue statement of Allstate Insurance Company that she had no witnesses, depending upon the trust and confidence she reposed in Allstate Insurance Company, unable to protect her own interests due to her weakened condition, tender age and lack of representation, signed a release of her claim against the defendant, Roberta L. Milner; that the disaffirmation of the release referred to in plaintiff's first reply is predicated upon defendant Roberta L. Milner's authorization of the aforementioned fraudulent acts of Allstate Insurance Company."

On October 6, 1964, by leave of court the plaintiff filed a separate count in chancery and an amendment to the supplemental reply heretofore filed, in which count in chancery plaintiff set out substantially the same material contained in the two replies, and prayed that the release be declared null and void. In the amendment to the supplemental reply the plaintiff has set out that on August 9, 1963, she sent by certified mail to defendant and Allstate Insurance Company a certified check for $450, payable to defendant; that the defendant and her agent and insurance carrier, Allstate Insurance Company, retained the above described check for over eleven

months. On October 28, 1964, the plaintiff filed a motion for summary judgment, supported by an affidavit of James N. Vail, her attorney, in which affidavit he reiterated the disaffirmation of the release and the retention of the certified check by Allstate Insurance Company for over eleven months. Attached to his affidavit was the notation of disaffirmance and tender back of consideration dated August 9, 1963. The notice was addressed to Roberta L. Milner and Allstate Insurance Company, and read as follows:

> "Please be advised that Judy Ann Brackeen disaffirms, rescinds and forever cancels a certain release tendered to her on or about April 12, 1963 at Henrotin Hospital, 939 N. LaSalle St., Chicago, Illinois, by a claims adjuster employed with and representing Allstate Insurance Company, and signed by said Judy Ann Brackeen for $450.00 while hospitalized and under treatment for fractured vertebrae, cerebral concussion, lacerations about the head and body and other serious and permanent injuries resulting from being struck by an automobile driven by Roberta L. Milner, 20 E. Goethe, Chicago, Illinois, on or about April 4, 1963, at or near State St. and Wacker Drive, Chicago, Illinois.
>
> "Be also advised that Judy Ann Brackeen tenders herewith the sum of $450.00 in the form of a certified check drawn on The Northern Trust Company and made payable to Allstate Insurance Company and Roberta L. Milner."

In support of plaintiff's motion for summary judgment a letter was also filed. The letter was from Allstate Insurance Company, dated July 20, 1964, addressed to Vail and Rollberg, and read as follows:

> "Enclosed please find your certified check in the amount of $450.00 that was forwarded to our office on August 9, 1963.

54

"Any inquiries regarding this matter will be handled by the law firm of Peterson, Lowry, Rall, Barber and Ross.

"Yours truly,

/s/ Ralph Widlic, Claim Examiner"

On November 19, 1964, Ralph Widlic filed an affidavit in which he stated among other things that he is the claim examiner employed by Allstate Insurance Company and is familiar with the suit of Brackeen v. Milner, and that Roberta L. Milner is Allstate's assured. He further stated that on or about August 13, 1963, he received a personal check in the amount of $450, drawn on the account of James N. Vail at the Northern Trust Company; that on or about August 15, 1963, affiant had a telephone conversation with Vail wherein affiant advised Vail that "Allstate Insurance Company considered valid a certain release of all claims against Roberta L. Milner signed by Judy Ann Brackeen on April 12, 1963; in said telephone conversation affiant refused to negotiate settlement of Miss Brackeen's claim based on personal injuries allegedly resulting from the negligence of Roberta L. Milner; affiant at no time informed Mr. Vail or Miss Brackeen that Allstate Insurance Company would accept a rescission or disaffirmance of the said release." Attached to the affidavit was the draft for $450 issued by the Allstate Insurance Company and cashed by Judy Ann Brackeen. The statement in Widlic's affidavit is not denied by the plaintiff.

It appears from the depositions in the record that Judy Ann Brackeen was 18 years old; that she lived with two girl friends in an apartment in Chicago; that her parents live in Ottawa, Illinois, and that she worked as a typist at the Chicago Motor Club where she earned $285 a month. She was involved in an automobile accident on April 4, 1963, at about 8:25 a. m., as she was walking across State Street on her way to work.

She was walking east on Wacker Drive, and as she approached the southwest corner the traffic light had been green for quite a while and she decided to wait for the next light. There were five or six people around her when the light turned green again, and she looked to her left to see if any cars were coming. A couple of people on her left obstructed her view, but they stepped off the curb and she also stepped off. She had just taken a couple of steps when she was struck by defendant's automobile; she was knocked unconscious for a few seconds, and was later helped to the defendant's car where she waited until the fire ambulance came and took her to Henrotin Hospital.

The plaintiff stated that the defendant told her she had just caught a glimpse of her tan coat, then felt a thud and thought she had a blowout; that she then looked back, saw the plaintiff on the street and stopped the car. The plaintiff further stated that she did not have the names of any witnesses to the accident and that she returned to work 17 days after the accident; that her doctor would not discharge her from the hospital and told her she should stay there for a longer period, but she signed her own release.

The plaintiff admitted signing the release in question and said that she saw John Bialek, the insurance adjuster, on Monday, Wednesday, Thursday and Friday, April 8, 10, 11 and 12, and on all of those occasions she was alone with him in her hospital room. She testified that Bialek, the agent, told her the insurance company would give her $300. She stated that after he had left on Wednesday afternoon, she telephoned her employer and told him all that had transpired in the two meetings with the agent; that her employer said her best bet would be to wait a little, after she was released from the hospital and then decide what she wanted to do. She testified that when the agent came to the hospital the next day he increased the offer to $450; that she

telephoned her mother that evening to tell her about the interviews and her mother told her she "should wait."

The plaintiff testified that when the agent returned to the hospital with a written release which he read to her and asked her to sign, she signed it. She stated that at the time she signed the release she felt a small headache; that since leaving the hospital she still had headaches and intended to go to a doctor to find out what caused them. Apparently her physical condition did not interfere with her work nor cause her any difficulty.

In an interrogatory propounded to the defendant, one Arnold R. Glickson was mentioned as a person who had knowledge of the case; in his deposition he stated that he did not see the accident and did not see the plaintiff until after she was lying on the street.

A deposition by Dr. Leo Pevsner was taken July 8, 1964, at which time he stated that on April 12, 1963, he had made a diagnosis of the plaintiff which disclosed cerebral concussion, laceration of the occipital scalp, contusion of the left chest wall, contusions of both legs, anterior tibial surfaces, compression fracture first, second lumbar vertebra, probable fracture of the 12th thoracic vertebra, and anemia. The doctor was referred to a letter sent him from Allstate Insurance Company, dated January 9, 1964, requiring certain answers to be filled in. One question was: "Was the patient in full control of her mental faculties and judgment, that is, judgment during the period of her hospital confinement?" To this question he answered "Yes." He also had answered "Yes" to the question of whether or not the plaintiff was rational.

■■■■■ The plaintiff urges that the pleadings, depositions and affidavits on file raise several questions of fact. The purpose of a summary judgment is not to pass upon facts but to determine cases on questions of

law where there are no material facts to be passed upon. The first question which must be considered by this court is whether or not the original release signed by the plaintiff was valid. It has been held that undue haste in securing a release from a person still suffering from an injury may cast suspicion on the validity of the release. Ruggles v. Selby, 25 Ill App2d 1, 165 NE2d 733. It is also the law that a release may be avoided for fraud or fraudulent representations made by the releasee or his agent and relied upon by the releasor to his injury. In 76 CJS, Release, § 27 subpar a, it is said:

> "It has been said that there is no reason why a release should be invalidated for fraudulent representation, except for the same reasons for which any other written instrument would be. Thus, in order to entitle a releasor to avoid a release on the ground of fraud or of a false or fraudulent representation, he must show, in addition to the fact of a false representation, that such representation was made with knowledge of its falsity on the part of the party making it, or was recklessly uttered without regard to, or knowledge of, its truth, or would, by the exercise of ordinary diligence, have been known to be false; *and it must also be shown that the releasor by acting on the fraud or false representation suffered damage or injury.*" (Emphasis supplied.)

It is true that in the instant case the agent of the insurance company visited the plaintiff at the hospital very soon after the accident. This court does not approve such practice on the part of insurance agents, and many states have statutes requiring that a certain time elapse between the injury and the signing of the release. We have no such statute in Illinois.

58

■ While it is true, as pointed out in Clancy v. Pacenti, 15 Ill App2d 171, 145 NE2d 802, that where releases are obtained in cases involving personal injuries, the release should be carefully considered because mistakes are easily made and the consequences are more serious than in any other of the affairs of man. It points out also that the injury may be much more serious than was apparent at the time the release was signed.

■ In the instant case there is nothing in the record before this court to indicate that the plaintiff had not fully recovered from the injuries she received. The fact that she stated she had headaches cannot be seriously considered since no connection between the headaches and the injuries is before the court. Evidence to this fact could very easily have been obtained at the time of the contest of the petition for a summary judgment. Under those circumstances, there is nothing before the court which would show that the amount of money paid by the defendant to the plaintiff was inadequate, and consequently, the release could not be attacked on the ground of fraud.

■ It is true that the plaintiff in the case was young, but she had consulted with her mother and her employer as to signing the release. She disregarded their advice; she disregarded advice of her attending physician, left the hospital on her own account and went back to work, apparently with no difficulty resulting from the accident. The vague testimony about her headaches does not raise any material question of fact. The holding of the trial court that the release is valid is affirmed.

■ The plaintiff raises another point. The release was signed on April 12, 1963; the plaintiff received defendant's check promptly and cashed it. On August 9, 1963, the plaintiff sent a notice to the defendant and Allstate Insurance Company of her disaffirmance of the

release, together with a certified check for $450. It is uncontradicted in the record that upon receipt of the letter, which was an attempt at unilateral rescission of the release contract, the defendants, through their agent, contacted plaintiff's attorney and stated that the Allstate Insurance Company considered the release valid, and that it refused to negotiate any further settlement of plaintiff's claim. However, the certified check sent by plaintiff's attorney to Allstate Insurance Company was not returned at that time, nor was it returned until July 20, 1964. We have been given no case which deals with this precise point; however, it is the law that a release is a contract, and consequently, the rescission of a release is governed by the rules prevailing in contract cases.

It would seem that it was the duty of the plaintiff, upon the defendant's uncontradicted repudiation of the unilateral rescission of the contract, to have demanded the return of the certified check attached to the rescission. Having failed to do that, no advantage can be taken of the fact that the defendant did not promptly return the check, but did not cash it or use the proceeds in any way. The judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

ENGLISH, P. J. and DRUCKER, J., concur.